**ROSEMONT ENTERPRISES, INC.,**
Plaintiff,

v.

**RANDOM HOUSE, INC. and John Keats,**
Defendants.

Howard R. Hughes, Maynard E. Montrose, Chester S. Johnson, Chester C. Davis and Gregson Bautzer, Additional Defendants on Counterclaim.

**No. 66 Civ. 1532.**

United States District Court
S. D. New York.
Dec. 22, 1966.

Katz, Moselle & Schier, New York City, for plaintiff; Chester C. Davis, Lola S. Lea, New York City, of counsel.

Weil, Gotshal & Manges, New York City, for defendant Random House, Inc. and co-attorneys for defendant John Keats; Horace S. Manges, Edward C. Wallace, Marshall C. Berger, New York City, of counsel.

Dilworth, Paxson, Kalish, Kohn & Dilks, Philadelphia, Pa., for defendant John Keats; William T. Coleman, Jr., Robert W. Maris, Philadelphia, Pa., of counsel.

## OPINION

WEINFELD, District Judge.

Plaintiff, Rosemont Enterprises, Inc. (Rosemont), commenced this action for copyright infringement against Random House, Inc., the publisher, and John Keats, the author, of a biography of Howard Hughes, hereafter referred to as The Book. The material allegedly infringed by the defendants consisted of articles published in three issues of Look Magazine in 1954, the copyrights to which Rosemont obtained from Cowles Communications, Inc. by assignment on May 20, 1966, followed six days later by the commencement of this action. The Book was published in between on May 23, 1966.

In June 1966 plaintiff applied for and was granted a preliminary injunction, which enjoined the defendants, pending final determination of the action, from distributing, advertising or selling copies of The Book.[1] The injunction was vacated by the Court of Appeals.[2] Familiarity with the factual references in the court's and the concurring opinions is assumed.

Rosemont and the third-party defendants now move pursuant to Rule 12(b)(6) and Rule 56 of the Federal Rules of Civil Procedure to dismiss the substantially similar counterclaim of each defendant upon the ground that upon its face and upon the undisputed facts it

1. Rosemont Enterprises, Inc. v. Random House, Inc., 256 F.Supp. 55 (S.D.N.Y. 1966).

2. 366 F.2d 303 (2d Cir. 1966).

fails to state a claim upon which relief can be granted. The nonresident third-party defendants additionally move to dismiss for lack of jurisdiction over the person. The third-party defendants against whom the counterclaim also is asserted are: Howard Hughes, the subject of the biography; Gregson Bautzer, attorney for Hughes or corporations controlled by him; Maynard E. Montrose, an officer or employee of corporations owned or controlled by Hughes; Chester S. Johnson, a former officer or employee of such corporations; and Chester C. Davis, also an attorney representing Hughes or corporations owned and controlled by him. With the exception of Davis, the other third-party defendants are citizens of either California or Texas and service of process upon them was effected pursuant to Rule 4(e) of the Federal Rules of Civil Procedure.

Stripped to its essentials, the counterclaim in substance alleges that prior to June 1965 Hughes, in concert with the other third-party defendants who allegedly are controlled by him and acted under his direction, embarked upon a scheme or plan to prevent and suppress the publication of The Book by the defendant Random House, which had been in preparation for publication by it since September 1962, as well as to prevent others from writing or publishing biographical material about him; that the scheme encompassed, among other matters, threats to Random House that Hughes would use his vast personal fortune to tie it up in costly and vexatious litigation to deter its publication; that similar threats were made to other publishers and authors; that in furtherance of the objective to prevent the publication of The Book, Rosemont was organized, at Hughes' behest, to engage in litigation to vex and annoy authors and publishers desiring to write and publish books and other material concerning Hughes and as a medium for paying moneys to authors and publishers who agreed to refrain from so doing; that to disguise Rosemont's real purpose, a fictitious arrangement was entered into between Rosemont and Hughes under which Rosemont was granted the sole and exclusive right to publish Hughes' life story and to exploit biographical material concerning him, but that the real purpose was to prevent others from publishing a biography of Hughes and to give Rosemont a colorable basis upon which to bring actions against authors and publishers attempting to write or publish books or other material about Hughes.

The counterclaim further alleges that Rosemont, based upon its claimed exclusive right to publish a Hughes biography, commenced an action in February 1966 in the Supreme Court of the State of New York against the defendants charging that the anticipated publication of The Book was a commercial exploitation of the name and personality of Hughes and an invasion of his right to privacy; that plaintiff knew the claims asserted in that action were without basis in law or fact; that its purpose was not to vindicate any right of Rosemont. Charges are also made that plaintiff, in furtherance of the objective to suppress the publication of Hughes' biographical material, bribed authors or other biographers of Hughes to violate their contractual commitments to their publishers and likewise attempted to bribe Keats, the author of The Book, who was under contractual obligation to Random House, and that one or more of the conspirators made it known to Random House that either plaintiff or Hughes would pay moneys and other valuable consideration to it to refrain from publishing a book or other material about Hughes.

The counterclaim further alleges that this suit, like the state court action, is without foundation in law or fact; that the Look articles were of no value when their copyright assignments were acquired by Rosemont; that the assignments were procured solely to give Rosemont a colorable claim upon which to institute this action; that both the state action and this action were commenced in furtherance of the plan to vex and harass the defendants herein and as vehicles to

carry out the conspiratorial design to suppress the publication of The Book and to deter other publishers and authors from writing or publishing books of materials on Hughes.

The defendants herein further charge that Rosemont and the third-party defendants, in furtherance of their basic conspiratorial purpose, intend to institute additional actions based on publication of The Book, knowing that such actions will have no basis in law or fact, and to engage in other acts calculated to vex and annoy the defendants, which acts are not presently known to them; and that the acquisition of the Look article copyrights constituted a violation of section 275 of the New York State Penal Law, McKinney's Consol.Laws, c. 40.[3]

Finally, the defendants charge that the lawsuits already commenced and all actions to date taken pursuant to said scheme or plan "were done maliciously and without justification in order to injure and damage the defendants herein and any other author or publisher who attempted to write or publish a book or other material concerning Hughes"; that as a result the defendants have suffered damages in a sum in excess of $25,000 and have suffered and will continue to suffer irreparable injury unless the parties to the claimed conspiracy are enjoined.

The above allegations are also pleaded as a separate defense of unclean hands which, it is asserted, deprives Rosemont of the right to equitable relief. However, we are here concerned only with the counterclaim based thereon, since the attack is directed only against it.

If the facts pleaded as a defense are established upon the trial, the plaintiff's conduct, under the views expressed in the concurring opinion of Chief Judge Lumbard, joined in by Judge Hays,[4] would be sufficent to bring into play the doctrine of unclean hands and to foreclose equitable relief.[5] However accepting the sufficiency of the defense as against Rosemont, it does not follow that the facts pleaded therein also state an independent cause of action against Rosemont, Hughes and the other third-party defendants entitling the defendants herein to affirmative equitable relief and money damages. While defendants seek to read into the concurring opinion a finding that the counterclaim, as well as the defense, was upheld as valid, the court's decision is no more than a holding that the District Court below abused its discretion in granting the preliminary injunction, since it did not appear there was a clear showing of probable success upon the trial upon the basic claim of infringement of the Look articles.[6] The Court of Appeals did not purport to consider the question of the validity of the counterclaim—indeed, the court's opinion delineated as the only issue before it: "Was the preliminary injunction erroneously issued as a matter of law?"[7]

The parties are in accord that the substantive law of the State of New York governs the issue of the sufficiency of the counterclaim. At the outset it should be borne in mind that New York does not recognize conspiracy as a substantive

3. "§ 275. Purchase of claims by corporations or collection agencies
"No person * * * and no corporation * * * directly or indirectly, * * * shall * * * buy or take an assignment of * * * a bond, promissory note, bill of exchange, book debt, or other thing in action, or any claim or demand, with the intent and for the purpose of bringing an action or proceeding thereon: * * *."

4. Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 311 (2d Cir. 1966).

5. T. B. Harms & Francis, Day & Hunter v. Stern, 231 F. 645, 648–649 (2d Cir. 1916).

6. See Imperial Chem. Indus., Ltd. v. National Distillers & Chem. Corp., 354 F.2d 459, 463 (2d Cir. 1965); Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738, 742 (2d Cir. 1953).

7. Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 304 (2d Cir. 1966).

tort, and the allegations that the third-party defendants and the plaintiff engaged in a joint scheme or plan or were co-conspirators do not transform an insufficient pleading into a good one.[8]

■■ Under New York law the actions commenced by Rosemont in the state court and in this court, however ill-inspired or ulteriorly motivated as the defendants here charge, do not, without more, support a counterclaim for damages or other relief.[9] And even if the actions were instituted by plaintiff maliciously and without probable cause, an action in favor of the defendants for malicious prosecution does not lie unless and until the claimed malicious suit has been terminated favorably to the claimant,[10] which is but one of the essential elements of the action.[11] Both this and the state action are still pending undetermined.

■ So, too, under New York law the counterclaim does not support a cause of action for malicious abuse of process. The two actions were instituted by Rosemont to vindicate its alleged claims that (1) it had the exclusive right to exploit the Hughes biographical material, and (2) the copyrights it acquired to the Look Magazine articles were infringed by the defendants. The assertion of these claims by Rosemont and resort to the courts to obtain an adjudication thereon does not constitute a tort. The New York courts have stressed that " 'The gist of the action for abuse of process lies in the improper use of process after it is issued,' "[12] and that no claim lies for the commencement of the action, notwithstanding it may have been maliciously or vindictively motivated. The counterclaim here is devoid of appropriate allegations to set forth a cause of action for malicious abuse of process.

The defendants, however, contend that the counterclaim alleges a cause of action for a prima facie tort, stated by one eminent state jurist as a doctrine "still in the process of growth,"[13] and more recently described by another as: "that open-ended, non-category, class or sub-class of tort [which] covers 'disinterested malevolence, * * *.' "[14] The generally accepted definition adopted by the New York courts[15] is based upon Mr. Justice Holmes' declaration that *"prima facie, the intentional infliction of temporal damages is a cause of action, which*

---

8. Goldstein v. Siegel, 19 A.D.2d 489, 493, 244 N.Y.S.2d 378 (1st Dep't 1963).

9. Hauser v. Bartow, 273 N.Y. 370, 7 N.E. 2d 268 (1937).

10. Hauser v. Bartow, 273 N.Y. 370, 7 N.E. 2d 268 (1937); Safie v. Safie, 19 A.D. 2d 900, 244 N.Y.S.2d 727 (2d Dep't 1963); Bronstein v. Dayton Peninsula Corp., 11 A.D.2d 1036, 206 N.Y.S.2d 12 (2d Dep't 1960); Ametco, Ltd. v. Beltchev, 5 A.D. 2d 631, 174 N.Y.S.2d 378 (1st Dep't 1958), aff'd, 7 N.Y.2d 783, 194 N.Y.S.2d 517, 163 N.E.2d 339 (1959); Louis J. Sigl, Inc. v. Bresnahan, 216 App.Div. 634, 215 N.Y.S. 735 (4th Dep't 1926). See also Adley Express Co. v. Corn Exch. Bank Trust Co., 99 F.Supp. 406 (S.D. N.Y.1951).

11. The essential elements of such a cause of action, based upon the bringing of a civil suit, are: (1) absence of probable cause; (2) malice; (3) termination of the suit favorably to the claimant, and (4) interference with the claimant's person or property by resort to a provisional remedy such as attachment, arrest or injunction.

12. Hauser v. Bartow, 273 N.Y. 370, 373, 7 N.E.2d 268, 269 (1937), quoting from Dean v. Kochendorfer, 237 N.Y. 384, 390, 143 N.E. 229 (1924). See also Metromedia, Inc. v. Mandel, 21 A.D.2d 219, 249 N.Y.S.2d 806 (1st Dep't), aff'd, 15 N.Y. 2d 616, 255 N.Y.S.2d 660, 203 N.E.2d 914 (1964); Bronstein v. Dayton Peninsula Corp., 11 A.D.2d 1036, 206 N.Y.S.2d 12 (2d Dep't 1960).

13. Rager v. McCloskey, 305 N.Y. 75, 80, 111 N.E.2d 214, 217 (1953) (Fuld, J.).

14. Morrison v. National Broadcasting Co., 24 A.D.2d 284, 287, 266 N.Y.S.2d 406, 409 (1st Dep't 1965) (Breitel, J.), appeal docketed, No. 369 (N.Y.).

15. Advance Music Corp. v. American Tobacco Co., 296 N.Y. 79, 83–84, 70 N.E. 2d 401 (1946); Opera on Tour, Inc. v. Weber, 285 N.Y. 348, 355, 34 N.E.2d 349, 136 A.L.R. 267, cert. denied, 314 U.S. 615, 62 S.Ct. 96, 86 L.Ed. 495 (1941).

\* \* \* requires a justification if the defendant is to escape." [16]

To cast the matter in proper perspective, some observations are in order. It may be assumed that Rosemont, the corporate plaintiff in both actions, was the vehicle used by Hughes, as defendants assert, as his alter ego in his and the other third-party defendants' efforts to suppress or control the publication of biographical material about him; also, that Hughes "has almost an obsession as to his privacy and his right thereto." [17] On the other hand, whether this obsession is genuine or feigned, Hughes, whether he wills it or not, is a public figure and as such "is subject to the often searching beam of publicity and that, in balance with the legitimate public interest, the law affords his privacy little protection." [18] However, while the privacy of a public figure is reduced in inverse ratio to his public status and in consequence he may be without any meaningful right of privacy, it is not wholly extinct; he is still entitled to protection against an unauthorized commercial exploitation of a fictionalized biography. [19] Hughes, through the plaintiff as his alter ego, if we accept defendant's allegations, contends that he had a right, by legal means, including the acquisition of the copyrights to the Look articles and the grant of the exclusive exploitation rights to Rosemont, to preserve, to the extent that he could, his right of privacy, however minimal it might be by reason of his status. The defendants, on the other hand, urge that since Hughes is a well known public figure and newsworthy, they had the right to publish an accurate biography of him, and that The Book does not violate his right of privacy or infringe upon any copyrights. [20] Hughes and the plaintiff, however, contend that notwithstanding the Court of Appeals' ruling on the preliminary injunction, The Book not only is an infringement of the Look articles, but is a fictitious version of his personality. Thus the merits of the basic issues in the existing suit remain to be resolved upon a trial.

In these circumstances, assuming, as defendants allege and as Rosemont and the third-party defendants deny, that the counterclaim sets forth a cause of action for prima facie tort under New York law, it should not be permitted to be asserted in this copyright infringement suit. There is ample authority to support this disposition. The policy of New York State is to avoid discouraging parties who believe their rights have been invaded from seeking redress in the courts under the threat of a countersuit

16. Aikens v. State of Wisconsin, 195 U.S. 194, 204, 25 S.Ct. 3, 5, 49 L.Ed. 154 (1904).

17. Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303, 309 (2d Cir. 1966).

18. Spahn v. Julian Messner, Inc., 18 N.Y. 2d 324, 328, 274 N.Y.S.2d 877, 879, 221 N.E.2d 543, 545 (1966). As stated by our Court of Appeals in this very case: "[W]hen one enters the public arena to the extent that he has, the right of privacy must be tempered by a countervailing privilege that the public have some information concerning important public figures." 366 F.2d 303, 309.

19. Spahn v. Julian Messner, Inc., 18 N.Y. 2d 324, 274 N.Y.S.2d 877, 221 N.E.2d 543 (1966), construing § 51 of the New York Civil Rights Law, McKinney's Consol.

Laws, c. 6. See also Hill v. Hays, 18 A.D.2d 485, 240 N.Y.S.2d 286 (1st Dep't 1963), aff'd, 15 N.Y.2d 986, 260 N.Y.S. 2d 7, 207 N.E.2d 604 (1965); possible jurisdiction noted sub nom. Time, Inc. v. Hill, 382 U.S. 936, 86 S.Ct. 392, 15 L.Ed. 2d 348 (1965), reargument ordered, 384 U.S. 995, 86 S.Ct. 1911, 16 L.Ed.2d 1012 (1966).

20. They rely on the principles declared in such cases as Sidis v. F–R Publishing Corp., 113 F.2d 806, 138 A.L.R. 15 (2d Cir.), cert. denied, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940); Estate of Hemingway v. Random House, Inc., 49 Misc.2d 726, 268 N.Y.S.2d 531, aff'd, 25 A.D.2d 719, 269 N.Y.S.2d 366 (1st Dep't 1966); Koussevitzky v. Allen, Towne & Heath, Inc., 188 Misc. 479, 68 N.Y.S.2d 779, aff'd 272 App.Div. 759, 69 N.Y.S. 2d 432 (1st Dep't 1947).

in response to the use of judicial machinery.[21]

This policy of assuring free access to the courts has been implemented by precluding a party from asserting his prima facie tort claim in the very action upon which it is based, in whole or in part, and requiring that it be litigated in an independent suit. The underlying rationale is that litigating the merits of such a counterclaim in the main suit would result in a proliferation of the issues of a plaintiff's claim and improperly impede the presentation of his evidence in support thereof or even prejudice the merits of the defendant's claim.

Thus, Presiding Justice Botein dismissed in the interests of justice a counterclaim which contained the technical ingredients of a prima facie tort, noting:

"While [defendant] alleges that plaintiff's instant action is baseless and invalid and brought in order to inflict intentional damage without justification, considerations of public policy require that this counterclaim be dismissed at this time. * * * Such a cause of action lowers the dam for a second main stream of evidence, with its own bundle of facts and law, its own burden of proof and measure of damages, and might impede or divert the progress of the plaintiff's main stream of evidence.

"When, as here, a counterclaim of this nature might well make a shambles of controversies already sufficiently complex, the court must address itself to its diuturnal task of balancing the consequences to the parties. Assuming, as we must in such an equation, that both the plaintiff's complaint and the defendant's counterclaim are meritorious, it would appear that there is grave danger that the merits of plaintiff's claim could easily be obscured or founder under the impact of so dramatic a counterclaim. Or, just as mischievous, the merits of defendants' claim may be prejudiced by the presentation of plaintiff's case."[22]

The doctrine has since been applied in a number of other cases where counterclaims were dismissed without prejudice to the commencement of an independent action.[23] The instant case warrants a similar disposition. An essential element of a prima facie tort is that the "intentional harm" was inflicted without justification. Resistance to the instant counterclaim centers about the contention that the acts complained of were not motivated by an intention to harm the defendants, but rather to protect Hughes in his desire to avoid publicity of any kind. In sum, the plaintiff's position and that of the third-party defendants (apart from other contentions) is that the grant by Hughes to Rosemont of the exclusive rights to the exploitation of his biography (the subject of the state suit) and the acquisition of the copyrights to the Look articles (the subject of this action) were entirely justified by Hughes' desire to preserve his right of privacy, no matter how much that right has been diminished by his

21. Porterfield v. Saffan, 7 A.D.2d 987, 183 N.Y.S.2d 896 (1st Dep't), aff'd, 7 N.Y. 2d 816, 196 N.Y.S.2d 696, 164 N.E.2d 716 (1959).

22. Knapp Engraving Co. v. Keystone Photo Engraving Corp., 1 A.D.2d 170, 172–173, 148 N.Y.S.2d 635, 637–638 (1st Dep't 1956).

23. Reback v. Story Prods., Inc., 9 A.D.2d 880, 193 N.Y.S.2d 520 (1st Dep't 1959). Cf. Bronstein v. Dayton Peninsula Corp.,

11 A.D.2d 1036, 206 N.Y.S.2d 12 (2d Dep't 1960); Stuyvesant Ins. Co. v. Matusow, 7 A.D.2d 843, 181 N.Y.S.2d 720 (1st Dep't 1959). See also Metromedia, Inc. v. Mandel, 21 A.D.2d 219, 249 N.Y. S.2d 806 (1st Dep't), aff'd, 15 N.Y.2d 616, 255 N.Y.S.2d 660, 203 N.E.2d 914 (1964); Lipshie v. Lazarus, 19 A.D.2d 608, 242 N.Y.S.2d 169 (1st Dep't 1963), aff'd, 14 N.Y.2d 713, 250 N.Y.S.2d 61, 199 N.E.2d 160 (1964).

public status. Hughes' self-interest in avoiding publicity could be advanced in explanation of these and those other acts condemned by the defendants and in negation of their charge of malicious intent to injury "even though the means employed might be of questionable morality and ethical validity." [24]

█ If the counterclaim were permitted in this action, it "might well make a shambles of controversies already sufficiently complex." [25] Thus a simple issue of whether the plaintiff infringed the Look articles would be subverted into a controversy of major proportions centering about Hughes' claimed predilection for anonymity and would open up a host of issues which have no place in a copyright suit. The considerations that come into play in a prima facie tort claim include "causation, sole motivation, excuse or justification." [26]

The court is not unmindful that the facts centering about the defense of unclean hands parallel some of the matters to be traversed in the counterclaim, but the purported justification for Hughes' actions and conduct, in resisting upon a trial the claim of an intentional infliction of wrongdoing, would necessarily go much beyond the defense; it would extend to a probe into subjective and personal matters over an extended period, not germane to the defense of unclean hands.

The counterclaim is dismissed but without prejudice to the commencement of a separate action.

This disposition makes it unnecessary to pass upon the nonresident third-party defendants' motion to dismiss for lack of jurisdiction over the person.

---

**24.** Benton v. Kennedy-Van Saun Mfg. & Eng'r Corp., 2 A.D.2d 27, 152 N.Y.S.2d 955, 958 (1st Dep't 1956).

**25.** See Knapp Engraving Co. v. Keystone Photo Engraving Corp., 1 A.D.2d 170, 172–173, 148 N.Y.S.2d 635, 637–638 (1st Dep't 1956).

**26.** See Penn-Ohio Steel Corp. v. Allis-Chalmers Mfg. Co., 7 A.D.2d 441, 445, 184 N.Y.S.2d 58, 62 (1st Dep't 1959).