Ronald E. **GALELLA**, Plaintiff-Appellant,

v.

Jacqueline **ONASSIS**, Defendant-Appellee,

John Walsh et al., Defendants,

and

United States of America, Intervenor-Appellee.

Nos. 260, 618 and 619, Dockets 71-1902, 72-1993 and 72-2312.

United States Court of Appeals, Second Circuit.

Argued April 10, 1973.

Decided Sept. 13, 1973.

Rehearing and Rehearing En Banc Denied Nov. 13, 1973.

Timbers, Circuit Judge, filed panel opinion concurring in part and dissenting in part.

Timbers, Circuit Judge, joined by Oakes, Circuit Judge, filed opinion dissenting from denial of rehearing en banc.

Hays, Circuit Judge, voted against en banc reconsideration but joined in neither opinion.

990

Alfred S. Julien, New York City (Stuart A. Schlesinger, David Jaroslawicz and Bennett D. Brown, New York City, of counsel), for plaintiff-appellant Galella.

Simon H. Rifkind, New York City (Paul, Weiss, Rifkind, Wharton & Garrison, Martin London and Lewis A. Kaplan, New York City, of counsel), for defendant-appellee Onassis.

A. W. Fargo, III, Asst. U. S. Atty. (Whitney North Seymour, Jr., U. S. Atty., S. D. N. Y., Michael D. Hess and William R. Bronner, Asst. U. S. Attys., of counsel), for intervenor-appellee United States and defendants-appellees John Walsh, James Kalafatis and John Connelly.

Before SMITH, HAYS and TIMBERS, Circuit Judges.

**J. JOSEPH SMITH, Circuit Judge:**

Donald Galella, a free-lance photographer, appeals from a summary judgment dismissing his complaint against three Secret Service agents for false arrest, malicious prosecution and interference with trade (S.D.N.Y., Edward C. McLean, Judge),[1] the dismissal after trial of his identical complaint against Jacqueline Onassis and the grant of injunctive relief to defendant Onassis on her counterclaim and to the intervenor, the United States, on its intervening complaint and a third judgment retaxing transcript costs to plaintiff (S.D.N.Y., Irving Ben Cooper, Judge), 353 F.Supp. 196 (1972). In addition to numerous alleged procedural errors, Galella raises the First Amendment as an absolute shield against liability to any sanctions.

The judgments dismissing the complaints are affirmed; the grant of injunctive relief is affirmed as herein modified. Taxation of costs against the plaintiff is affirmed in part, reversed in part.

Galella is a free-lance photographer specializing in the making and sale of photographs of well-known persons. Defendant Onassis is the widow of the late President, John F. Kennedy, mother of the two Kennedy children, John and Caroline, and is the wife of Aristotle Onassis, widely known shipping figure and reputed multimillionaire. John Walsh, James Kalafatis and John Connelly are U. S. Secret Service agents assigned to the duty of protecting the Kennedy children under 18 U.S.C. § 3056, which provides for protection of the children of deceased presidents up to the age of 16.

Galella fancies himself as a "paparazzo" (literally a kind of annoying insect, perhaps roughly equivalent to the Eng-

I. "MEMORANDUM DECISIONS BY
THE COURT
70 Civ. 4348

The nature of this controversy between plaintiff, a professional photographer, and defendant Jacqueline Onassis, the widow of President Kennedy is briefly described in my memorandum on motion No. 79 decided herewith.

The present motion is made by defendants Walsh, Kalafatis and Connelly to dismiss the action against them for failure to state a claim. They have supported their motion by affidavits. I will treat it as a motion for summary judgment.

The moving defendants are Special Agents of the United States Secret Service. The Secret Service is charged by statute with the responsibility for protecting the persons of minor children of a former president until they reach the age of 16. 18 U.S.C. § 3056. These defendants were assigned to protect the children of President Kennedy, Caroline and John Jr., neither of whom is sixteen. They were acting in that capacity throughout the period involved in this action.

It is well settled that a government employee is immune from suit for acts done in the course of his official duties within the scope of his employment. Barr v. Mateo [Matteo] 360 U.S. 564 [79 S.Ct. 1335, 3 L.Ed.2d 1434] (1959); Gregoire v. Biddle, 177 F.2d 579 (2d Cir. 1949); Ove Gustavsson Contracting Co. v. Floete, 299 F.2d 655 (2d Cir. 1962).

The question is whether these defendants were acting within the scope of their employment in performing the acts of which plaintiff complains. I have no doubt that they were. The fact that plaintiff feels aggrieved by their acts is immaterial. Doubtless this is a factual question but plaintiff's affidavits in opposition to this motion do not raise a triable issue on this aspect of the case. For sound policy reasons explained at length in the decisions on the subject, these agents, under the circumstances of this case are immune from suit and may not be called upon to defend themselves against plaintiff's extravagant claims.

The decision of the Supreme Court in Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics [403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619] (June 21, 1971) relied upon by plaintiff does not, in my opinion, require the denial of this motion. Not only were the facts of that case very different from those here, but more important, the Supreme Court expressly stated that it was not passing upon the question of immunity from liability by virtue of their official position. 39 U.S. Law Week at 4824.

The motion is granted. The action is dismissed as against John Walsh, James Kalafatis and John Connelly.

/s/ EDWARD McLEAN
USDJ

Dated: July 2, 1971"

lish "gadfly.") Paparazzi make themselves as visible to the public and obnoxious to their photographic subjects as possible to aid in the advertisement and wide sale of their works.[2]

Some examples of Galella's conduct brought out at trial are illustrative. Galella took pictures of John Kennedy riding his bicycle in Central Park across the way from his home. He jumped out into the boy's path, causing the agents concern for John's safety. The agents' reaction and interrogation of Galella led to Galella's arrest and his action against the agents; Galella on other occasions interrupted Caroline at tennis, and invaded the children's private schools. At one time he came uncomfortably close in a power boat to Mrs. Onassis swimming. He often jumped and postured around while taking pictures of her party notably at a theater opening but also on numerous other occasions. He followed a practice of bribing apartment house, restaurant and nightclub doormen as well as romancing a family servant to keep him advised of the movements of the family.

After detention and arrest following complaint by the Secret Service agents protecting Mrs. Onassis' son and his acquittal in the state court, Galella filed suit in state court against the agents and Mrs. Onassis. Galella claimed that under orders from Mrs. Onassis, the three agents had falsely arrested and maliciously prosecuted him, and that this incident in addition to several others described in the complaint constituted an unlawful interference with his trade.

Mrs. Onassis answered denying any role in the arrest or any part in the claimed interference with his attempts to photograph her, and counterclaimed for damages [3] and injunctive relief, charging that Galella had invaded her privacy,

assaulted and battered her, intentionally inflicted emotional distress and engaged in a campaign of harassment.

The action was removed under 28 U. S.C. § 1442(a) to the United States District Court. On a motion for summary judgment, Galella's claim against the Secret Service agents was dismissed, the court finding that the agents were acting within the scope of their authority and thus were immune from prosecution. At the same time, the government intervened requesting injunctive relief from the activities of Galella which obstructed the Secret Service's ability to protect Mrs. Onassis' children.[4] Galella's motion to remand the case to state court, just prior to trial, was denied.

Certain incidents of photographic coverage by Galella, subsequent to an agreement among the parties for Galella not to so engage, resulted in the issuance of a temporary restraining order to prevent further harassment of Mrs. Onassis and the children. Galella was enjoined from "harassing, alarming, startling, tormenting, touching the person of the defendant . . . or her children . . . and from blocking their movements in the public places and thoroughfares, invading their immediate zone of privacy by means of physical movements, gestures or with photographic equipment and from performing any act reasonably calculated to place the lives and safety of the defendant . . . and her children in jeopardy." Within two months, Galella was charged with violation of the temporary restraining order; a new order was signed which required that the photographer keep 100 yards from the Onassis apartment and 50 yards from the person of the defendant and her children. Surveillance was also prohibited.

Upon notice of consolidation of the preliminary injunction hearing and trial

---

2. The newspapers report a recent incident in which one Marlon Brando, annoyed by Galella, punched Galella, breaking Galella's jaw and infecting Brando's hand.

3. The damage claim was later dropped and a claim for violation of New York Civil Rights

Act §§ 50, 51 (McKinney's Consol.Laws, c. 6 1948) added.

4. The Secret Service is responsible for protecting the children of former presidents until the age of 16. 18 U.S.C. § 3056.

for permanent injunction, plaintiff moved for a jury trial—nine months after answer was served, and to remand to state court. The first motion was denied as untimely, the second on grounds of judicial economy. Just prior to trial Galella deposed Mrs. Onassis. Under protective order of this court, the defendant was allowed to testify at the office of the U. S. Attorney and outside the presence of Galella.

After a six-week trial the court dismissed Galella's claim and granted relief to both the defendant and the intervenor. Galella was enjoined from (1) keeping the defendant and her children under surveillance or following any of them; (2) approaching within 100 yards of the home of defendant or her children, or within 100 yards of either child's school or within 75 yards of either child or 50 yards of defendant; (3) using the name, portrait or picture of defendant or her children for advertising; (4) attempting to communicate with defendant or her children except through her attorney.

 We conclude that grant of summary judgment and dismissal of Galella's claim against the Secret Service agents was proper. Federal agents when charged with duties which require the exercise of discretion are immune from liability for actions within the scope of their authority. Ordinarily enforcement agents charged with the duty of arrest are not so immune. Bivens v. Six Unknown Named Agents of Fed. Bur. of Narc., 456 F.2d 1339 (2d Cir. 1972). The protective duties assigned the agents under this statute, however, require the instant

exercise of judgment which should be protected. The agents saw Galella jump into the path of John Kennedy who was forced to swerve his bike dangerously as he left Central Park and was about to enter Fifth Avenue, whereupon the agents gave chase to the photographer. Galella indicated that he was a press photographer listed with the New York City Police; he and the agents went to the police station to check on the story, where one of the agents made the complaint on which the state court charges were based. Certainly it was reasonable that the agents "check out" an individual who has endangered their charge,[5] and seek prosecution for apparent violation of state law which interferes with them in the discharge of their duties.

██ If an officer is acting within his role as a government officer his conduct is at least within the outer perimeter of his authority. *Bivens, supra*, 456 F.2d at 1345.[6] The Secret Service agents were charged under 18 U.S.C. § 3056 with "guarding against and preventing any activity by any individual which could create a risk to the safety and well being of the . . . children or result in their physical injury." It was undisputed that the agents were on duty at the time, and there was evidence that they believed John Kenendy to be endangered by Galella's actions. Unquestionably the agents were acting within the scope of their authority.[7]

 To be sure, even where acting within their authority, not all federal agents are immune from liability. Immunity is accorded officials whose de-

5. Even where an absolute privilege has been denied police officers charged with false arrest, good faith and reasonable belief in the validity of the arrest is an affirmative defense. *See* Pierson v. Ray, 386 U.S. 547, 555–557, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967) (§ 1983 action) ; *Bivens, supra*, 456 F.2d at 1341, 1348 ; Boyd v. Huffman, 342 F.Supp. 787, 789 (N.D.Ohio, W.D.1972).

6. *Bivens* suggests that so long as the officer is acting in his role as a government agent he is acting within the "outer perimeter of his line of duty." *Bivens, supra*, 456 F.2d at 1348.

*Compare* Spalding v. Vilas, 161 U.S. 483, 16 S.Ct. 631, 40 L.Ed. 780 (1896) ; Gregoire v. Biddle, 177 F.2d 579, 580–581 (2d Cir. 1949), cert. denied, 339 U.S. 949, 70 S.Ct. 803, 94 L.Ed. 1363 (1950) ; Barr v. Matteo, 360 U.S. 564, 572–573, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959).

7. The failure to label the complaint as one made by an officer does not alter the fact that the incident occurred while the agents were unquestionably carrying out their duties of protection of John's person.

cisions involve an element of discretion so that the decisions may be made without fear or threat of vexatious or fictitious suits and alleged personal liability. Ove Gustavsson Contracting Co. v. Floete, 299 F.2d 655, 659 (2d Cir. 1962), cert. denied, 374 U.S. 827, 83 S.Ct. 1862, 10 L.Ed.2d 1050 (1963). The issue in each case is whether the public interest in a particular official's unfettered judgments outweighs the private rights that may be violated.[8] See Bivens, supra, 456 F.2d at 1346. The protective duties of the agents on assignments similar to this warrant this protection.[9] See Scherer v. Brennan, 379 F.2d 609 (7th Cir.), cert. denied, 389 U.S. 1021, 88 S.Ct. 592, 19 L.Ed.2d 666 (1967).

■ Discrediting all of Galella's testimony [10] the court found the photographer guilty of harassment, intentional infliction of emotional distress, assault

and battery, commercial exploitation of defendant's personality, and invasion of privacy. Fully crediting defendant's testimony, the court found no liability on Galella's claim. Evidence offered by the defense showed that Galella had on occasion intentionally physically touched Mrs. Onassis and her daughter, caused fear of physical contact in his frenzied attempts to get their pictures, followed defendant and her children too closely in an automobile, endangered the safety of the children while they were swimming, water skiing and horseback riding. Galella cannot successfully challenge the court's finding of tortious conduct.[11]

■ Finding that Galella had "insinuated himself into the very fabric of Mrs. Onassis' life . . ." the court framed its relief in part on the need to prevent further invasion of the defendant's privacy. Whether or not this accords with present New York law, there

8. Persons to whom immunity has been provided include: the Attorney General of the United States, Directors of the Enemy Alien Control Unit of the Department of Justice and the District Director of Immigration who wrongfully arrested a plaintiff as a German enemy alien and kept him in custody after establishment of his French citizenship, Gregoire, supra; a Director of Rent Stabilization who issued a press release defamatory to several employees who had given out incorrect information concerning the compensation methods of employees of the department, information which caused considerable Congressional criticism of the agency, Barr, supra; government officials who through false reports of plaintiff's failure to perform adequately on his contract caused the contract to be canceled, Ove Gustavsson Contracting, supra; Secret Service agents assigned to protect the President who kept under close personal surveillance a firearms dealer who possessed a large number of weapons near the President's temporary residence when he refused to leave the area while the President was in residence, Scherer, supra. See also Krause v. Rhodes, 471 F.2d 430, 445–446 (6th Cir. 1972) (O'Sullivan, J., concurring); Reese v. Nixon, 347 F.Supp. 314, 317–318 (C.D.Cal.1972). See, generally, Second Circuit Review, 39 Brooklyn L.Rev. 907, 943 (1973).

9. In Bivens the court stated that "the fiction that this act [arrest] is not discretionary is maintained because of the belief that the benefit to society derived from the protection of

personal liberties outweighs the detriment of perhaps deterring vigorous police action." It based this interpretation on (1) the lack of immunity for police officers under the common law; (2) laxity of police regard for individual rights as reflected in numerous cases before the courts; and (3) the lack of immunity for state police under the Civil Rights Act. 456 F.2d at 1346–1347. However, the duty of protecting the personages singled out by Congress as in need of this extraordinary shield from likely harm is toto coelo different from the normal police function of arrest for law violation on warrant or on probable cause as in Bivens.

10. The court's findings on credibility are indeed broad, but they are supported in the record. Galella demonstrated a galling lack of respect for the truth and gave no indication of any consciousness of the meaning of the oath he had taken. Not only did he admit blatantly lying in his testimony, he admitted attempting to have other witnesses lie for him.

11. Harassment is a criminal violation under New York Penal Law § 240.25 (McKinney's Consol.Laws, c. 40, 1967) when with intent to harass a person follows another in a public place, inflicts physical contact or engages in any annoying conduct without legitimate cause. Galella was found to have engaged in this proscribed conduct. Conduct sufficient to invoke criminal liability for harassment may be the basis for private action. Cf. Long v. Beneficial Finance Co. of New York, 39 A.D.2d 11, 330 N.Y.S.2d 664 (1972).

is no doubt that it is sustainable under New York's proscription of harassment.[12]

Of course legitimate countervailing social needs may warrant some intrusion despite an individual's reasonable expectation of privacy and freedom from harassment. However the interference allowed may be no greater than that necessary to protect the overriding public interest. Mrs. Onassis was properly found to be a public figure and thus subject to news coverage. *See* Sidis v. F. R. Publishing Corp., 113 F.2d 806 (2d Cir.), cert. denied, 311 U.S. 711, 61 S.Ct. 393, 85 L.Ed. 462 (1940). Nonetheless, Galella's action went far beyond the reasonable bounds of news gathering. When weighed against the *de minimis* public importance of the daily activities of the defendant, Galella's con-

stant surveillance, his obtrusive and intruding presence, was unwarranted and unreasonable. If there were any doubt in our minds, Galella's inexcusable conduct toward defendant's minor children would resolve it.

Galella does not seriously dispute the court's finding of tortious conduct. Rather, he sets up the First Amendment as a wall of immunity protecting newsmen from any liability for their conduct while gathering news. There is no such scope to the First Amendment right. Crimes and torts committed in news gathering are not protected. *See* Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972); Rosenbloom v. Metromedia, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971); Dietemann v. Time, Inc., 449 F.2d 245, 249–250 (9th Cir. 1971). *See*

12. *See* n. 11, *supra.*

Although the New York courts have not yet recognized a common law right of privacy, if we were required to reach the question, we would be inclined to agree with the court below that when again faced with the issue the Court of Appeals may well modify or distinguish its 1902 holding in Roberson v. Rochester Folding-Box Co., 171 N.Y. 538, 64 N.E. 442 (1902), that "The so-called right of privacy has not as yet found an abiding place in our jurisprudence." There is substantive support today for the proposition that privacy is a "basic right" entitled to legal protection, Time v. Hill, 385 U.S. 374, 415, 87 S.Ct. 534, 17 L.Ed.2d 456 (1967) (Fortas, J., dissenting), nor can the "power of a State to control and remedy such intrusion [even] for news gathering purposes . . . be denied." *Id.* at 404, 87 S.Ct. at 550 (Harlan, J., concurring and dissenting). Privacy essential to individual dignity and personal liberty underlies the fundamental rights guaranteed in the Bill of Rights. *See* Katz v. United States, 389 U.S. 347, 350 n. 5, 88 S.Ct. 507, 19 L.Ed. 2d 576 (1967); Tehan v. U. S. ex rel. Shott, 382 U.S. 406, 416, 86 S.Ct. 459, 15 L.Ed.2d 453 (1966) (Fifth Amendment); Stanley v. Georgia, 394 U.S. 557, 564–566, 89 S.Ct. 1243, 22 L.Ed.2d 542 (1969) (First and Fourteenth Amendments). *See also* Time v. Hill, *supra*, 385 U.S. at 412–415, 87 S.Ct. 534; Bloustein, Privacy As An Aspect of Human Dignity: An Answer to Dean Prosser, 39 N.Y.U. L.Rev. 962, 971 (1964); Fried, Privacy, 77 Yale L.J. 475, 482ff (1968). There is an emerging recognition of privacy as a distinct, constitutionally protected right.

Roe v. Ingraham, 480 F.2d 102 (2d Cir., 1973), (Friendly, J.)

While the Constitution provides protection for specific manifestations of privacy " . . . the protection of a person's general right to privacy—his right to be let alone by other people is like the protection of his property and his very life left largely to the law of the individual states. . . . " *Katz, supra,* 389 U.S. at 350–351, 88 S.Ct. at 511, citing Warren & Brandeis, Right to Privacy, 4 Harv. L.Rev. 193 (1890).

The vast majority of states have now recognized and protect a right to privacy. Restatement of Torts 2d § 652(a), comment *a* (Tent.Draft No. 13, 1967). Statutory protection has been afforded the right in New York through imposition of criminal sanctions for invasion of privacy through the use of mechanical devices for wiretap and eavesdropping and for tampering with certain private communications. New York Penal Code §§ 250.00–250.35 (McKinney, 1967).

Although not recognizing a right to privacy as such except as defined by statute, the New York courts have softened this rule in many cases by recognizing and liberally applying freedom from emotional distress as a protectable interest. *See* Long v. Beneficial Finance Co. of New York, 39 A.D.2d 11, 330 N.Y.S.2d 664, 667–668 (1972); Halio v. Lurie, 15 A.D.2d 62, 222 N.Y.S.2d 759, 763–764 (1961); Callarama v. Associates Discount Corp. of Delaware, 69 Misc.2d 287, 329 N.Y.S.2d 711 (1972); Ruiz v. Bertolotti, 37 Misc.2d 1067, 236 N.Y.S.2d 854 (1962), aff'd mem. 20 A.D.2d 628, 245 N.Y.S.2d 1003 (1963).

Restatement of Torts 2d § 652(f), comment k (Tent. Draft No. 13, 1967). There is no threat to a free press in requiring its agents to act within the law.

 In addition to his substantive claims, Galella challenges the court's (a) refusal to remand the case; (b) refusal to allow a jury trial despite an untimely request; (c) exclusion of Galella from defendant's deposition; (d) failure to recuse himself; (e) consolidation of the temporary injunctive proceedings and trial on the merits. Numerous claims of error in evidentiary rulings are also raised. Little need be said about most of these evidentiary rulings; [13] the rulings were either clearly correct or if error, harmless.[14] Galella's procedural claims must fail.

 Galella's claim against Mrs. Onassis, originally in federal court as an action joined with that against the Secret Service agents, was not automatically stripped of federal pendent jurisdiction by the dismissal of the claim against the agents. United Mineworkers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); see Almenares

v. Wyman, 453 F.2d 1075, 1084 (2d Cir. 1971), cert. denied, 405 U.S. 944, 92 S.Ct. 962, 40 L.Ed.2d 815 (1972). Whether the claim was to be remanded was within the court's discretion after consideration of judicial economy and fairness to the litigants. United Mineworkers v. Gibbs, *supra*, 383 U.S. at 726, 86 S.Ct. 1130. The motion to remand was made six months after dismissal of the suit against the agents and on the eve of trial; the United States Government had then intervened in the case,[15] a series of hearings on the substantive claims had been heard by the federal court, a special master in charge of discovery had been appointed and a number of motions had been heard, and others were pending.[16] As no claim of unfairness has been raised, considerations of judicial economy govern and support the court's denial of the motion to remand. A great deal of judicial effort had been expended in covering ground that must be gone over anew had remand been ordered.

 Untimely requests for jury trial must be denied unless some cause beyond mere inadvertence is shown. Noonan v. Cunard Steamship Co., 375

13. (a) The propriety of defendant's testimony as to mental distress—this was plainly admissible on the claim of harassment; (b) the admission of the children's affidavits into evidence—this was questionable since the children were not shown to be no longer available; (c) the admission of the hearsay declartion of one of the children—this was clearly admissible to show the children's reaction to Galella's antics; (d) the admission of the record of the Secret Service investigation—it was conceded that this was made in the regular course of Secret Service business; (e) the admission of defendant's impression or understanding of a card received from Galella—since her state of mind was at issue this was properly admitted; (f) denial of plaintiff's request to produce a statement made to defense counsel by defendant's witness, Duchin—no use was made of the statement in the trial; (g) failure to draw an inference of unfavorable testimony from the failure of defendant to call her husband as a witness—such an inference was surely not compelled here; and (h) refusal to direct defense counsel to produce an expert witness' work product—the ruling may be sustained in the

light of the availability to plaintiff of experts on photography.

14. The ruling on the affidavits of the children may well be error but in the light of the overwhelming other proof the ruling was surely harmless.

15. The United States' presence in the case created a real threat of two trials—one federal and one state—on the same operative facts if the Onassis-Galella claims were remanded. The government claim would remain in federal court. While predominance of state law questions is an important factor, the probability of two trials on the same facts has been deemed generally sufficient to weigh in favor of retaining pendent jurisdiction; Note, Federal Pendent Subject Matter Jurisdiction— The Doctrine of United Mineworkers v. Gibbs Extended to Persons Not Party to the Jurisdiction-Conferring Claim, 73 Colum.L.Rev. 153, 165–67 (1973).

16. Two temporary restraining orders had been issued, two protective orders made, summary judgment motions heard and one granted and approximately fourteen other motions made and some were still pending.

F.2d 69 (2d Cir. 1967). Galella explains the delay in making the request as a result of the removal proceedings and the fact that New York does not require a written request for a jury trial. Precisely the same allegations were made and correctly rejected in Leve v. General Motors Corp., 248 F.Supp. 344 (S.D. N.Y.1965). No error was made in refusing to excuse the untimeliness of the motion; any other decision would have been reversible error. *See Noonan, supra*, 375 F.2d at 70.

Circumstances of a deposition may be governed by the court's protective order. The court may order that "discovery be conducted with no one present except persons designated by the court." Fed.R.Civ.P. 26(c). The extent of the court's authority to determine those present was enlarged by the 1970 revision of the Rules of Discovery. Prior to the revision, Rule 30(b) allowed the court to order discovery to be conducted "with no one present except the parties to the action and their officers or counsel. . . ." In view of the revision, it is clear that the court has the power to exclude even a party,[17] although such an exclusion should be ordered rarely indeed.

The grant and nature of protection is singularly within the discretion of the district court and may be reversed only on a clear showing of abuse of discretion. Chemical & Industrial Corp. v. Druffel, 301 F.2d 126, 129 (6th Cir. 1962); Essex Wire Corp. v. Eastern Electric Sales Co., 48 F.R.D. 308, 310 (E.D.Pa.1969). While we might have assessed the need to exclude Galella differently, we cannot find the court's ruling clearly erroneous. At the time the order was issued, Galella had already been charged with violation of the court's temporary restraining order which was entered to protect the defendant from further harassment. Such conduct could

be deemed to reflect both an irrepressible intent to continue plaintiff's harassment of defendant and his complete disregard for judicial process. Anticipation of misconduct during the examination could reasonably have been founded on either.

The court's refusal to recuse himself was correct. See United States ex rel. Brown v. Smith, 200 F. Supp. 885, 930 (D.Vt.1961), rev'd on other grounds, 306 F.2d 596 (2d Cir. 1962), cert denied, 372 U.S. 959, 83 S.Ct. 1012, 10 L.Ed.2d 11 (1963); United States v. Sclafani and Ross, 487 F.2d 245 at 255 (2d Cir. 1973). A judge may be disqualified for bias only on motion supported by a written affidavit of facts supporting the claim of bias and a certificate of good faith from the counsel of record. 28 U.S.C. § 144. Galella failed to comply with the statute; no showing was made of a legal basis for the claim, no motion was made nor affidavit filed. Informal requests to the court, or failure to comply with the statute because of an expectation of denial, however well founded, cannot be substituted for compliance with § 144.

Galella claims that notice given him of consolidation under Rule 65(a)(2) of preliminary injunction proceedings and the trial was inadequate in that he was not advised of the consolidation sufficiently in advance of trial to properly prepare. The claim borders on the frivolous. The required notice under Rule 65 is solely for the purpose of alerting the parties that the hearing is to be the final determination of the action. See 7 J. Moore, Federal Practice ¶ 65.04[4]. Galella knew five weeks before trial that the actions on the preliminary and permanent injunction had been consolidated. There is thus no merit to an attack on sufficiency of notice under Rule 65.

Essentially Galella's challenge is one of denial of due process; he contends

17. The order is appropriate to protect the deponent from embarrassment or ridicule intended by the calling party. *See* 4 J. Moore, Federal Practice ¶26.73.

that the court's scheduling of trial unfairly limited his preparation for trial. The claim is based generally on depositions and discovery either not made or not completed.[18] Here any lack of discovery was due to plaintiff's own dilatory actions; it was not error for the court to proceed. *See* Eli Lilly & Co. v. Generix Drug Sales, 460 F.2d 1096, 1105 (5th Cir. 1972). Issue was joined and counterclaim filed by September, 1970, and the case removed in October, 1970. Yet even by the time of trial in 1972 Galella had not yet noticed for deposition defendant's husband (a witness Galella says he was deprived of deposing by the scheduling.)[19]

▇ Scheduling of trials is for the trial courts. Only where actual and substantial prejudice can be shown will a court's calendar orders be reviewed. Galella has made no such showing. He himself requested consolidation in October, 1971; that motion was withdrawn in January, 1972; the court however indicated that it would consolidate the proceedings as both the plaintiff and defendant had requested, and planned to go to trial as soon as a space opened on his calendar. Galella had five weeks' notice of the expected date of trial.

▇ Injunctive relief is appropriate. Galella has stated his intention to continue his coverage of defendant so long as she is newsworthy, and his continued harassment even while the temporary restraining orders were in effect indicate

that no voluntary change in his technique can be expected. New York courts have found similar conduct sufficient to support a claim for injunctive relief. Flamm v. Van Nierop, 56 Misc.2d 1059, 291 N.Y.S.2d 189 (1968).[20]

▇ The injunction, however, is broader than is required to protect the defendant. Relief must be tailored to protect Mrs. Onassis from the "paparazzo" attack which distinguishes Galella's behavior from that of other photographers; it should not unnecessarily infringe on reasonable efforts to "cover" defendant. Therefore, we modify the court's order to prohibit only (1) any approach within twenty-five (25) feet of defendant or any touching of the person of the defendant Jacqueline Onassis; (2) any blocking of her movement in public places and thoroughfares; (3) any act foreseeably or reasonably calculated to place the life and safety of defendant in jeopardy; and (4) any conduct which would reasonably be foreseen to harass, alarm or frighten the defendant.

▇ Any further restriction on Galella's taking and selling pictures of defendant for news coverage is, however, improper and unwarranted by the evidence. *See* Estate of Hemingway v. Random House, Inc., 49 Misc.2d 726, 268 N.Y.S.2d 531, 535, aff'd 25 A.D.2d 719, 269 N.Y.S.2d 366 (1966); Youssoupoff v. Columbia Broadcasting, 41 Misc. 2d 42, 244 N.Y.S.2d 701, 704, aff'd 19 A.D.2d 865, 244 N.Y.S.2d 1 (1963); Thompson v. C. P. Putnam's Sons, 40

---

18. Galella's claim of lack of time to review the deposition of defendant is patently without merit. The initial deposition was taken a month prior to trial; a second session on questions raised and previously unanswered in the first session was held six days before trial.

19. Of the four persons noticed for deposition within six weeks of trial, three were Secret Service agents known to Galella from the commencement of the suit. The fourth witness was made known in December, 1971; there was no surprise in his testifying and he was fully cross-examined at trial.

20. The defendant in *Flamm* was sued for intentional infliction of emotional distress. He was charged with having dashed at the plaintiff in a threatening manner in various public places with threatening gestures, grimaces, leers, distorted faces and malign looks, accompanied by ridiculous utterances and laughs, driven his automobile behind that of the plaintiff at a dangerously close distance; walked behind or beside or in front of the plaintiff on the public streets; and consistently telephoned the plaintiff at home and place of business and hung up or remained on the line in silence.

Misc.2d 608, 243 N.Y.S.2d 652, 654 (1965).

Likewise, we affirm the grant of injunctive relief to the government modified to prohibit any action interfering with Secret Service agents' protective duties. Galella thus may be enjoined from (a) entering the children's schools or play areas; (b) engaging in action calculated or reasonably foreseen to place the children's safety or well being in jeopardy, or which would threaten or create physical injury; (c) taking any action which could reasonably be foreseen to harass, alarm, or frighten the children; and (d) from approaching within thirty (30) feet of the children.

Taxation of costs of a daily transcript of trial may be assessed against a party by the court, where they are "necessarily obtained for use in the case." 28 U.S.C. § 1920. *See* Oscar Gruss & Son v. Lumbermens Mutual Casualty Co., 422 F.2d 1278 (2d Cir. 1970). Galella was ordered to pay the cost of four daily copies, one each for the government intervenor and the court, and two for defendant.[21] To assess the losing party with the premium cost of daily transcripts, necessity—beyond the mere convenience of counsel—must be shown. Delaware Valley Marine Supply Co. v. American Tobacco Co., 199 F.Supp. 560, 561 (E.D.Pa.1960). We cannot say that no such showing has been made here.[22] There does not, however, appear any justification for allowing multiple copies to the defendant. Galella therefore should not be taxed for any more than the cost of a transcript at the daily rate for three copies, one for the defendants, one for the intervenor and one for the court.[23] See Farmer v. Arabian American Oil Co.,

379 U.S. 227, 235, 85 S.Ct. 411, 416, 13 L.Ed.2d 240 (1964):

> "We do not read that Rule [Rule 54 (d)] as giving district judges unrestrained discretion to tax costs to reimburse a winning litigant for every expense he has seen fit to incur in the conduct of his case. Items proposed by winning parties as costs should always be given careful scrutiny. Any other practice would be too great a movement in the direction of some systems of jurisprudence that are willing, if not indeed anxious, to allow litigation costs so high as to discourage litigants from bringing lawsuits, no matter how meritorious they might in good faith believe their claims to be."

As modified, the relief granted fully allows Galella the opportunity to photograph and report on Mrs. Onassis' public activities. Any prior restraint on news gathering is miniscule and fully supported by the findings.

Affirmed in part, reversed in part and remanded for modification of the judgment in accordance with this opinion. Costs on appeal to be taxed in favor of appellees.

TIMBERS, Circuit Judge (concurring in part and dissenting in part):

With one exception, I concur in the judgment of the Court and in the able majority opinion of Judge Smith.

With the utmost deference to and respect for my colleagues, however, I am constrained to dissent from the judgment of the Court and the majority opinion to the extent that they modify the injunctive relief found necessary by the district court to protect Jacqueline Onas-

---

21. Transcript costs taxed against Galella amounted to $17,561.80.

22. While the two primary witnesses had been extensively deposed prior to trial and the substance of the case had been previously heard in summary judgment motions, the amounts claimed were large, the trial was of considerable length, and credibility crucial.

23. Where no prejudice will result from an untimely motion to retax costs, the court may excuse failure to comply with Rule 6(d)'s five-day motion period. *See* United States v. Kolesar, 313 F.2d 835, 837 n. 1 (5th Cir. 1963). It was thus proper to allow the government's motion to retax.

sis and her children, Caroline B. and John F. Kennedy, Jr., from the continued predatory conduct of the self-proclaimed paparazzo Galella.

We start with what I take to be common ground that "a district court has broad discretion to enjoin possible future violations of law where past violations have been shown"; that "the court's determination [that permanent injunctive relief is required] should not be disturbed on appeal unless there has been a clear abuse of discretion"; and that "the party seeking to overturn the district court's exercise of discretion has the burden of showing that the court abused that discretion, and the burden necessarily is a heavy one." SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1100 (2 Cir. 1972). That certainly is the settled law in this Circuit. And it is the command of Fed.R.Civ.P. 52(a).

In the instant case, after a six week trial at which 25 witnesses testified, hundreds of exhibits were received and a 4,714 page record was compiled, Judge Cooper filed a careful, comprehensive 40 page opinion, 353 F.Supp. 194, which meticulously sets forth detailed findings of fact and conclusions of law. As for the provisions of the injunction requiring Galella to keep certain distances away from Mrs. Onassis and her children (from the modification of which I dissent), Judge Cooper stated his reasons for these provisions as follows:

"For practical reasons, the injunction cannot be couched in terms of prohibitions upon Galella's leaping, blocking, taunting, grunting, hiding and the like. Nor have abstract concepts—harassing, endangering— proved workable. No effective relief seems possible without the fixing of proscribed distances.

We must moreover make certain plaintiff keeps sufficiently far enough away to avoid problems as to compliance with the injunction and injurious disobedience. Disputes concerning his compliance may be frequent, thereby necessitating repeated application to the Court. Hence, the restraint must be clear, simple and effective so that Galella's substantial compliance cannot seriously be disputed unless a violation occurs.

Of major importance in determining the scope of the relief to be afforded here is the attitude which Galella has demonstrated toward the process of this Court in the past. Galella blatantly violated our restraining orders of October 8 and December 2, 1971. He did so deliberately and in full knowledge of the fact of his violation. His deliberate disobedience to the subpoena and his attempts to obstruct justice with respect to Exhibit G, together with the perjury that infected his testimony, do not warrant mere token relief.

In light of Galella's repeated misbehavior, it is clear that only a strong restraint—an injunction which will clearly protect Mrs. Onassis' rights and leave no room for quibbling about compliance and no room for evasion or circumvention—is appropriate in this case.

\* \* \*

As for the actual distance to be proscribed, we must bear in mind that plaintiff never moved to modify the distances heretofore imposed by our restraining order, even after the Court had clearly and explicitly invited him to do so if he could prove it was too harsh. (Minutes, Proceedings January 19, 1972, p. 31)." 353 F.Supp. at 237.

I have set forth the foregoing explanation by Judge Cooper of his reasons for the critical distance provisions of the injunction because they are weighty findings by the trial judge who had the benefit of seeing the parties before him and who obviously was in a better position than we to judge their demeanor. I feel very strongly that such findings should not be set aside or drastically modified by our Court unless

they are clearly erroneous; and I do not understand the majority to suggest that they are.

But here is what the majority's modification of the critical distance provisions of the injunction has done:

| DISTANCES GALELLA IS REQUIRED TO MAINTAIN | AS PROVIDED IN DISTRICT COURT INJUNCTION | AS MODIFIED BY COURT OF APPEALS MAJORITY |
|---|---|---|
| From home of Mrs. Onassis and her children | 100 yards | No restriction |
| From children's schools | 100 yards | Restricted only from entering schools or play areas * |
| From Mrs. Onassis personally | 50 *yards* | 25 *feet* and not to touch her |
| From children personally | 75 *yards* | 30 *feet* * |

In addition to modifying the distance restrictions of the injunction, the majority also has directed that Galella be prohibited from blocking Mrs. Onassis' movement in public places and thoroughfares; from any act "foreseeably or reasonably calculated" to place Mrs. Onassis' life and safety in jeopardy (and similarly with respect to her children); and from any conduct which would "reasonably be foreseen" to harass, alarm or frighten Mrs. Onassis (and similarly with respect to her children).

With deference, I believe the majority's modification of the injunction in the respects indicated above to be unwarranted and unworkable. Briefly summarized, the following are the reasons for my dissent from the modification of the injunction:

(1) The majority ignores the weighty findings of the district court. Without holding them clearly erroneous,

Fed.R.Civ.P. 52(a), the majority simply sets them aside and substitutes its own perimeters for those carefully and wisely drawn by the district court.

(2) This results, for example, in a wholly unexplained and anomalous 84% reduction of the distance Galella is required to keep away from Mrs. Onassis (from 50 *yards* to 25 *feet*), and an equally implausible 87% reduction of the distance he is required to keep away from the children (from 75 *yards* to 30 *feet*).

(3) It further results in no restriction whatsoever against Galella's hovering at the entrance to the home of Mrs. Onassis and her children (where he has caused such agonizing humiliation in the past), or at the schools attended by the children —just so he does not physically en-

* As pointed out below, the majority appears further to have modified the injunction by limiting the protection of the children to the "grant of injunctive relief to the *government* modified to prohibit any action interfering with Secret Service agents' protective duties." (emphasis added). The district court injunc-

tion was not so limited. It granted injunctive relief for the protection of the children as specifically prayed for *by Mrs. Onassis.* The distinction introduced by the majority, as indicated below, substantially reduces the protection provided for the children.

ter their schools or play areas. This strikes me as an invitation for trouble.

(4) The majority, in substituting its own injunctive provisions for those of the district court, has couched its prohibitions in terms of conduct *"foreseeably or reasonably calculated"* to endanger the life or safety of Mrs. Onassis or her children, or conduct which would *"reasonably be foreseen"* to harass, alarm or frighten them. (emphasis added). These are just the sort of abstract concepts which the district court found to be unworkable and ineffective. 353 F. Supp. at 237. They do not comply with the specificity requirement of Fed.R.Civ.P. 65(d) ("Every order granting an injunction . . . shall be specific in terms. . . ."). This has been construed by our Court to require that "the party enjoined must be able to ascertain from the four corners of the order precisely what acts are forbidden." Sanders v. Air Line Pilots Association, 473 F.2d 244, 247 (2 Cir. 1972). See International Longshoremen's Association v. Philadelphia Marine Trade Association, 389 U.S. 64, 76 (1967); Brumby Metals, Inc. v. Bargen, 275 F.2d 46, 49 (7 Cir. 1960). The district court was justifiably concerned—in view of Galella's record of outrageous disregard of the court's previous restraining orders—that it would be confronted with repeated compliance applications in the future. The majority's substitution of such abstract concepts as "reasonably foreseen" and "foreseeably calculated" for the clear, simple and effective distance restrictions in the district court injunction seems to me virtually to assure the compliance disputes that the district court wisely sought to avert.

(5) In modifying the injunctive relief granted by the district court, I fear that the majority has overlooked the fact that the record shows that Galella in the past has jeopardized the lives and safety of Mrs. Onassis and her children and has done so *in the teeth of previous restraining orders of the district court.* One of the particularly weighty findings of the district court in support of the scope of injunctive relief granted was that "Galella blatantly violated our restraining orders of October 8 and December 2, 1971. He did so deliberately and in full knowledge of the fact of his violation." 353 F.Supp. at 237. Our Court has been particularly adamant against disturbing a district court's grant of injunctive relief when the parties enjoined "continued to violate the . . . laws even after a consent decree had been entered enjoining them from such conduct" and when "[t]hey have persisted in their contention that their past conduct was not improper . . . ." SEC v. Koenig, 469 F.2d 198, 202 (2 Cir. 1972), citing SEC v. MacElvain, 417 F.2d 1134, 1137 (5 Cir. 1969), cert. denied, 397 U.S. 972 (1970), and SEC v. Manor Nursing Centers, Inc., supra.

(6) All else aside, the wisdom and fairness of the distance restrictions which the district court provided for in its permanent injunction—which are substantially identical to those in its temporary restraining order of December 2, 1971 and which were in effect until July 20, 1972—appear to be borne out by the failure of Galella ever to request the district court to modify such restrictions, despite the express invitation of the district court to Galella to do so: "As for the actual distance to be proscribed, we must bear in mind that plaintiff never moved to modify the distances heretofore imposed by our restraining order, even after the Court had clearly and explicitly invited him to do so if he could prove it was too harsh." 353 F. Supp. at 237. Pursuant to the district court's decision of July 5, 1972

requesting that the form of injunction be settled on three days notice, both sides submitted proposed judgments which were identical in all respects here material; neither in his proposed form of judgment nor in his memorandum accompanying it did Galella interpose any objection whatsoever to the distance restrictions on the ground that they were too harsh or onerous. Since the district court never was afforded an opportunity to pass upon such questions which are raised for the first time on appeal, I see no compelling reason for departing from the long settled rule in this Circuit that such matters should not be reached by us on appeal. Ring v. Authors' League of America, 186 F.2d 637, 641 (2 Cir.) (L. Hand, C. J.: "If a party's sensibilities are so tender, the least we must demand is that he make known his complaint at a time when it can be remedied."), cert. denied sub nom. Ring v. Spina, 341 U.S. 935 (1951); United States v. Five Cases, 179 F.2d 519, 523–24 (2 Cir.) (Swan, C. J., aff'g judgment entered on jury verdict after trial before Hincks, D. J.), cert. denied, 339 U.S. 963 (1950). At the very least, if there is to be any modification of the injunction with respect to the distance provisions (and I believe none is warranted), then the case should be remanded to the district court which obviously is in a far better position to make such determinations after a hearing than are we. After all, what possible basis is there in this record for us as appellate judges to say that Galella should keep 25 feet, rather than 50 yards, away from Mrs. Onassis; or that he should remain 30 feet, rather than 75 yards, away from the children?

(7) Finally, I am utterly unable to find any basis in the record or any justification as a matter of law for the majority's modification of the injunction so as to limit the protection provided for the children to the "grant of injunctive relief to the *government* modified to prohibit any action interfering with Secret Service agents' protective duties." (emphasis added). *Supra* at p. 999. Just two paragraphs before this, the majority has modified the injunction to prohibit Galella from engaging in four types of conduct directed at "defendant Jacqueline Onassis", with no mention of the children. *Id.* And yet the claim for injunctive relief sought in the counterclaim filed March 8, 1971 was explicitly "for the personal safety of defendant [Mrs. Onassis] and of her infant children". The judgment entered July 20, 1972 provided, in paragraph 4, for injunctive relief for the protection of Mrs. Onassis and both of her children; the only reference to the government in the injunctive provisions of the judgment is in subparagraph (viii) of paragraph 4 where Galella is enjoined from "otherwise interfering with any agent of the United States of America in the performance of protective duties relating to Caroline B. Kennedy or John F. Kennedy, Jr." As I read the majority's modification of the injunction, to the extent that it distinguishes between protection for Mrs. Onassis and that for the children, limiting the latter to the grant of injunctive relief to the government, the net effect is to strip the children of any protection under the injunction after they reach age 16 when their protection by the Secret Service ceases. 18 U.S.C. § 3056 (1970). For Caroline, who was born November 27, 1957, this means that one of her birthday presents—less than two months away—will be exposure to the resumed predatory conduct of the paparazzo Galella who will be totally unrestrained with respect to her by the injunction as modified by the majority. For John, who was born November 25, 1960, he has only three

years to wait for similar exposure. To strip these children, before they reach their majority, of the protection of the injunction of the United States District Court below, is to deny to them and to their mother the very least to which they are entitled under the law.

I most respectfully dissent.

### ON PETITION FOR REHEARING

A petition for a rehearing having been filed herein by counsel for appellee Jacqueline Onassis,

Upon consideration thereof, it is

Ordered that said petition be and it hereby is denied.

TIMBERS, Circuit Judge, votes to grant the petition for rehearing.

### ON PETITION FOR RE- HEARING EN BANC

A petition for a rehearing containing a suggestion that the action be reheard en banc having been filed herein by counsel for appellee Jacqueline Onassis, and a poll of the judges in regular active service having been taken on the request of such a judge, and Chief Judge Kaufman, Circuit Judges Friendly, Hays, Feinberg, Mansfield and Mulligan having voted to deny the petition, and Circuit Judges Oakes and Timbers having voted to grant the petition, and a per curiam opinion and an opinion by Circuit Judge Timbers having been filed,

Upon consideration thereof, it is

Ordered that said petition be and it hereby is denied.

### PER CURIAM:

Our brothers Oakes and Timbers have, as they characterize it, dissented "once again"[1] from this Court's denial of en banc reconsideration of a panel decision. In their dissenting opinion, they have recognized that en banc review is not appropriate simply to resolve a mere disagreement with the outcome reached by a panel of this Court. Our dissenting brothers note, however, that they find in this case not merely an erroneous decision but a substantial question of unusual importance. Wholly aside from our view whether it was proper for the panel to modify the district court's decree, we cannot agree with their assessment of the importance of the question before us.

Although we sympathize with the plight of Mrs. Onassis, it hardly need be stated that the importance of a decision does not turn on whether the litigants stand in the limelight of public recognition or in the shadows of anonymity. Rather, significance rests on the precedential impact that a determination of this Court is likely to have on the future course of the law and hence on the lives of countless others.

When examined from this perspective, it is quite clear that the panel's decision does not rise to the threshold of importance requisite to en banc reconsideration. To be sure the issue of what constitutes the appropriate standard for appellate review of the terms of an injunctive decree is indeed important. And, if the panel had recast the traditional yardstick into a test other than abuse of the wide discretion accorded the district court in formulating its decree, International Salt Co. v. United States, 332 U.S. 392, 400–401, 68 S.Ct. 12, 92 L. Ed. 20 (1947); United States v. National Lead Co., 332 U.S. 319, 335, 67

---

1. The three cases cited by our dissenting brothers as illustrative of our failure to "be more gingerly about declining to act as a full court in ruling upon substantial questions of unusual importance," Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1020–1026 (2 Cir. 1973), cert. granted, 414 U.S. 908, 94 S.Ct. 235, 38 L.Ed.2d 146 (1973); Boraas v. Village of Belle Terre, 476 F.2d 806, 824–827 (2 Cir. 1973), prob. juris. noted, 414 U.S. 907, 94 S. Ct. 234, 38 L.Ed.2d 145 (1973); Zahn v. International Paper Co., 469 F.2d 1033, 1040–1042 (2 Cir. 1972), cert. granted, 410 U.S. 925, 93 S.Ct. 1370, 35 L.Ed.2d 585 (1973), indeed only prove the wisdom of our careful selectivity. At a time of burgeoning calendars, we do well at least to recognize those cases which should not tarry in this Court many months during en banc proceedings when resolution by the Supreme Court is inevitable. Surely our insight was confirmed when the highest court agreed to review our panel decisions in the cited cases.

S.Ct. 1634, 91 L.Ed. 2077 (1947), then we too would have responded affirmatively to a request for en banc review. But it did not do this. Although several members of the Court may dislike the result, the principle embodied in the majority's opinion is not a departure from the established rule. Since we foresee minimal precedential impact for this decision, and because we are properly concerned that the sparse judicial resources of this Court should not be expended unnecessarily—particularly where the question is not of unusual importance—reconsideration of the question en banc would be wholly unwarranted.

TIMBERS, Circuit Judge, with whom OAKES, Circuit Judge, concurs (dissenting from denial of rehearing en banc):

Once again, although Judge Oakes and I have voted in favor of en banc reconsideration of the 2–1 panel decision in this case, we have been unsuccessful in mustering a majority vote of the active judges to do so. While we recognize that we may be fighting a rear guard action in our attempt to persuade our colleagues to be more gingerly about declining to act as a full court in ruling upon substantial questions of unusual importance, we nevertheless have not given up hope. Moreover, the pattern that has emerged from recent similar situations is quite clear. See, e. g., Eisen v. Carlisle & Jacquelin, 479 F.2d 1005, 1020–26 (2 Cir. 1973) (en banc denied, 5–3), cert. granted, 42 U.S.L.W. 3226 (U.S. Oct. 15, 1973); Boraas v. Village of Belle Terre, 476 F.2d 806, 824–27 (2 Cir. 1973) (en banc denied, 4–4), prob. juris. noted, 42 U.S.L.W. 3226 (U.S. Oct. 15, 1973); Zahn v. International Paper Co., 469 F.2d 1033, 1040–42 (2 Cir. 1972) (en banc denied, 4–3, i. e. 4 in favor of en banc, 3 against), cert. granted, 410 U.S. 925 (1973), aff'd, 42 U.S.L.W. 4087 (U.S. Dec. 17, 1973).

I have already stated as best I can in my panel dissent, 487 F.2d at 999, the reasons I believe the majority's modification of the injunctive relief found necessary by the district court to protect Mrs. Onassis and her children from the continued predatory conduct of Galella constituted an unwarranted appellate interference with the district court's discretion, especially absent any suggestion by the majority that the weighty findings of the district court were clearly erroneous. We recognize at this stage of the case, however, that an en banc rehearing normally will not be granted " 'merely' to correct individual injustices or mistakes". Eisen, supra, 479 F.2d at 1021–22. When a clearly erroneous panel decision as here is rendered in the context of—or is coupled with—a substantial question of unusual importance, then we believe the case is ripe for en banc reconsideration.

There would appear to be few issues more vital and of more recurring importance in the administration of federal justice than the appropriate standard by which an appellate court reviews the grant or denial of permanent injunctive relief by a district court. Are we bound by the command of Fed.R.Civ.P. 52(a) that "[f]indings of fact shall not be set aside unless clearly erroneous"? Or are we free as appellate judges, without the slightest basis in the record for doing so, to substitute our own injunctive provisions for those of the district court? With due respect to the panel majority, we believe that it is beyond dispute that here there was an unwarranted appellate interference with the discretion of the trial judge in fashioning relief based upon all of the facts after hearing all of the testimony and after judging the demeanor of all of the witnesses. It is on the basis of excessive and wholly unwarranted appellate intrusion into the traditional area of trial court operations that we believe this case cries out for en banc reconsideration.

Such appellate intrusion here is particularly exacerbated by the fact that the district court's temporary restraining order of October 8, 1971, 353 F.Supp. at 200 n. 6, which was very similar to the decree refashioned by the panel majority on appeal, had already been deliberately violated by Galella. 353 F.Supp. at

237–38. It is undisputed that in the past he had jeopardized the lives and safety of Mrs. Onassis and her children and had done so in the teeth of previous restraining orders of the district court.

Moreover, we believe that it is important to note the internal inconsistency of the panel majority's condemnation of Galella's outrageous and dangerous conduct toward Mrs. Onassis and her children on the one hand, and its effectively stripping them of the protection of the district court injunction on the other, including the wholly incomprehensible elimination of any protection whatsoever for the children after they reach age 16.

In short, here, as we suggested a year ago in *Zahn, supra,* 469 F.2d at 1042, "The record in this case strikes [us] as a particularly good one on which to resolve this important issue. The facts are not in dispute. The legal question is starkly presented. The issue to be resolved is both important and sure to recur."

We respectfully dissent from the denial of rehearing en banc.

HAYS, Circuit Judge, votes against en banc reconsideration but joins in neither opinion.

Mulligan, Circuit Judge, filed dissenting opinion.